THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| MICHAEL FULLER, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | **3:15-CV-2197** |
| | : | **(JUDGE MARIANI)** |
| BOROUGH OF WYOMING, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

In this action, Michael Fuller ("Plaintiff"), a former police sergeant for the Borough of
Wyoming, claims that the Borough and Mayor Robert Boyer (collectively "Defendants"),
retaliated against him for engaging in protected speech. Specifically, Plaintiff's Second
Amended Complaint, (Doc. 21), brings two First Amendment retaliation claims pursuant to
42 U.S.C. § 1983 which allege that Defendants suspended Plaintiff and took other adverse
employment action against him in retaliation for Plaintiff (1) reporting Defendant Boyer's
girlfriend's misconduct to the Pennsylvania State Police (Count I), and (2) filing the present
lawsuit (Count II). Presently before the Court is Defendants' Motion for Summary
Judgment. (Doc. 40). For the reasons that follow, the Court will grant in part and deny in
part Defendants' Motion.

## II. Statement of Undisputed Facts

Before delving into the facts of this case, the Court is forced to deal with a preliminary issue. Rule 611 of the Federal Rules of Evidence provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." Fed. R. Evid. 611(c). Rule 30 of the Federal Rules of Civil Procedure provides that "[t]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615." Fed. R. Civ. P. 30(c)(1). Rule 30 also states, "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

The Third Circuit has stated that "it is generally improper for [an] attorney to employ leading questions" when "pos[ing] questions to a friendly witness during a direct examination." *Jarbough v. Attorney Gen.*, 483 F.3d 184, 192 (3d Cir. 2007) (citing Fed. R. Evid. 611(c)).

> Leading questions are undesirable in this context because of their suggestive power. The "search for the truth," *Nix v. Whiteside*, 475 U.S. 157, 171, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986), in our adjudicatory system is best served when the finder of fact considers the testimony of the friendly witness based upon his or her recollection, not the testimony of counsel calling the witness. Suggesting answers to the friendly witness may "supply a false memory for the witness—that is, to suggest desired answers not in truth based upon real recollection." 3 John Henry Wigmore, *Evidence* § 769, at 154 (Chadbourne Rev. 1970). See *Hall v. Clifton Precision*, 150 F.R.D. 525, 531 (E.D. Pa. 1993) ("It should go without saying that lawyers are strictly prohibited from

2

making any comments, either on or off the record, which might suggest or limit a witness's answer to an unobjectionable question.").

*Id.* at 192-93.

The *Hall* decision, cited by the *Jarbough* court above, involved an attorney who sought to confer with his client while the client was being deposed and to take recesses for such conferences to occur. *Hall*,150 F.R.D.at 526. The court held that these practices—as well as the practice of interposing objections that "suggest or limit a witness's answer to an unobjectionable question"—were inappropriate and abused the deposition process. *See id.* at 530-31. The court observed,

The underlying purpose of a deposition is to find out what a witness saw, heard, or did—what the witness thinks. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. *The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness—not the lawyer—who is the witness.* As an advocate, the lawyer is free to frame those facts in a manner favorable to the client, and also to make favorable and creative arguments of law. But the lawyer is not entitled to be creative with the facts. Rather, a lawyer must accept the facts as they develop.

*Id.* at 528 (footnote omitted) (emphasis added).

Turning to the case at hand, the following exchange took place between Plaintiff and his Counsel at Plaintiff's deposition:

3

BY MS. POLLICK:

Q    And let's go through your complaint. If you could go to Defendant's 2
     page 3, and if you could read starting at page 11.

. . .

Q    Go to page three and if you could start reading at page 11 and then if
     you could after each allegation say if that is true or not.

     MR. McDONOUGH: Paragraph 11 –

     MS. POLLICK: Paragraph.

     MR. McDONOUGH: – I think you meant to say.

     MS. POLLICK: Yes.

BY MS. POLLICK:

Q    So, 11.

A    Eleven: On or about August 7, 2015, plaintiff reported official
     misconduct related to Defendant Boyer's girlfriend who was also
     defendant borough of borough manager.

Q    So can you attest if that's true or false?

A    True.

Q    Number 12?

A    Number 12: Plaintiff reported that Boyer's girlfriend may have
     committed wrongdoing/crime by fixing a bid to the Pennsylvania State
     Police and the Federal Bureau of Investigation, FBI, which are both
     outside of the plaintiff's chain of command. The plaintiff specifically
     spoke with Pennsylvania State Trooper Bill Schutter and an unknown
     or a name unknown FBI agent.

Q    True or false?

4

A    True. Thirteen: Plaintiff was acting as a citizen when he went outside the chain of his command and reported official misconduct with Boyer's girlfriend to the Pennsylvania State Police and FBI.

Q    True or false?

MR. McDONOUGH: Object to the form.

MR. JENNINGS: Objection.

MR. McDONOUGH: Calls for a legal conclusion.

BY MS. POLLICK:

Q    You can answer the question.

A    True.

(Dep. of Michael Fuller, Doc. 42-1 at 95-97). Much of Plaintiff's counsel's questions

proceeded in this manner. For example:

BY MS. POLLICK:

Q    Then I'm going to skip a couple and then go to 44.

A    Forty-four: But for engaging in protective activities and seeking access to The Courts, Plaintiff Fuller has been subjected to even more retaliatory acts which shows a continuing campaign of harassment.

Q    True or false?

MR. JENNINGS: Objection; leading, calls for legal conclusion.

THE WITNESS: True. Forty-five: On or about November 22, 2015, Defendant Boyer ignored plaintiff while he participated in the West Side Santa parade.

5

BY MS. POLLICK:

Q    True or false?

MR. JENNINGS: Objection, leading.

THE WITNESS: True. Forty-six: On December 4, 2016 -- it should say '15 I believe, that's a typo.

BY MS. POLLICK:

Q    Okay.

A    Plaintiff was falsely accused of being insubordinate in retaliation for having filing this lawsuit.

Q    True or false?

MR. JENNINGS: Objection; leading, calls for a legal conclusion.

THE WITNESS: True. . . .

(*Id.* at 107-08).

This line of leading questions by Plaintiff's counsel was completely inappropriate and frustrated the purposes of the deposition. Further, this Court has previously admonished Plaintiff's counsel for using leading questions when deposing her own witnesses. *See Caso v. Luzerne County*, 2015 WL 1951610, at \*15-\*17 (M.D. Pa. 2015). In *Caso* this Court specifically stated that "Plaintiffs' counsel is now on notice that if she continues to use leading questions while deposing friendly witnesses, the Court 'may impose [further] appropriate sanction[s]—including the reasonable expenses and attorney's fees incurred by any party.'" *Id.* at \*17 (alterations in original) (quoting FED. R. CIV. P. 30(d)(2)).

In light of the fact that Plaintiff's counsel has been unwilling or unable to comply with the Federal Rules of Evidence, the Federal Rules of Civil Procedure, and this Court's directives, the Court has no choice but to strike from the record all of Plaintiff's answers that were made in response to leading questions posed by his own counsel. With these answers excised from the record, the Court now turns to the facts of this case.

In accordance with Local Rule 56.1, Defendants submitted a Statement of Material Facts in Support of their Motion for Summary Judgment, (Doc. 41), as to which they contend that there is no genuine dispute for trial, and Plaintiff submitted a response, (Doc. 47). Thus, the following facts are undisputed, except as specifically noted:

In August of 2015, Plaintiff was working as a police sergeant at the Wyoming Borough Police Department. (Dep. of Michael Fuller, Doc. 42-1 at 125-26). At that time, he had been working for the Department for over twenty years and was one of three full-time employees along with Commissioner Michael Flanagan and Captain Chris Mercavitch.[1] (*Id.* at 34, 65). Plaintiff also held part-time jobs as a patrol officer with Forty Fort Police Department and Luzerne Police Department. (*Id.* at 13; Doc. 42-2 at 1, 35-42).

On August 1, 2015, Plaintiff met with Commissioner Flanagan and Defendant Boyer for a semi-annual employee evaluation. (Doc. 42-2 at 1). At that meeting, Defendant Boyer warned Plaintiff that he was working too many hours at his other jobs and told him that he needed to cut back to no more than thirty-two hours a week of outside work. (*Id.*; Dep. of

---

[1] In a companion case docketed at 3:16-CV-32, Mercavitch also brings two First Amendment retaliation claims—as well as several other claims—against the Borough of Wyoming and Mayor Boyer.

Michael Fuller, Doc. 42-1 at 53-54). Although the record is conflicted as to whether any specific policies were discussed during the evaluation, a Wyoming Borough Personnel Regulation, dated April 14, 2015, provided that "[f]ull-time employees are prohibited from holding another full-time position or equivalent outside their regular Borough employment." (Doc. 42-2 at 34). Plaintiff maintains that he was first made aware of this policy on September 8, 2015, when a copy was placed in his office. (*Id.* at 1; Dep. of Michael Fuller, Doc. 42-1 at 56-57).

Around the time of the evaluation, Plaintiff had a conversation with a friend, Charles Story, and was told about Story's recent purchase of a dump truck from the Borough of Wyoming. (Dep. of Michael Fuller, Doc. 42-1 at 39-41; Doc. 42-2 at 26). According to Plaintiff, Story indicated that the Borough Manager, Tamra Smith—who was dating Defendant Boyer—lowered Story's bid so he could obtain the truck for less money. (Dep. of Michael Fuller, Doc. 42-1 at 16, 41). Plaintiff relayed the story to Captain Mercavitch and they decided that Plaintiff should contact the Pennsylvania State Police. (*Id.* at 39-42). On August 7, 2015, Plaintiff met Trooper Schutter of the Pennsylvania State Police and expressed his concern that Smith fixed the bid on the dump truck. (Doc. 41 at ¶¶ 9-10; Doc. 47 at ¶¶ 9-10; Doc. 1 at ¶¶ 11-12).

On September 11, 2015, Plaintiff received a letter from Defendant Boyer stating that Plaintiff had thirty days to comply with the outside employment policy and that failure to do so may result in disciplinary action. (Doc. 42-2 at 1, 33). Nevertheless, Plaintiff continued

to work hours at his other jobs in excess of thirty-two hours a week. (*Id.* at 35-37).

Additionally, on November 17, 2015, Plaintiff filed the present lawsuit claiming that

Defendants had retaliated against him for his report to Trooper Schutter. (Doc. 1). On

December 4, 2015, Plaintiff received notice that a Loudermill hearing would be held to

address what the Borough believed was Plaintiff's failure to comply with the outside

employment policy. (Doc. 42-5 at 2-3). The hearing was held six days later. (*Id.*). On

January 7, 2016, Plaintiff received a five day unpaid suspension. (Doc. 42-2 at 1).

After the suspension, Plaintiff continued to work more than thirty-two hours a week at

his other jobs. (*Id.* at 38-42). On March 22, 2016, Plaintiff received notice that a second

Loudermill hearing would be conducted because the Borough believed Plaintiff was still not

complying with the outside employment policy. (*Id.* at 44). The hearing was held on April 6,

and, nine days later, Plaintiff received notice that the Borough was suspending him for

fifteen days without pay. (*Id.* at 45). According to the Borough, Plaintiff was suspended

because he "engaged in insubordinate conduct and repeatedly failed to comply with the

outside employment policy." (*Id.*).

While serving his suspension, Plaintiff received notice of a third Loudermill hearing.

(*Id.*; Doc. 46-1 at 1). Then, on April 28, 2016, while still on suspension, Plaintiff resigned his

position. (Dep. of Michael Fuller, Doc. 42-1 at 78). In a letter to Defendant Boyer dated

May 5, 2016, Plaintiff stated that "due to the continued harassment, I am forced to resign my

9

position from the Wyoming Borough Police Department and vest my pension benefits."
(Doc. 42-2 at 43).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not
present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,
. . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence
of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106
S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-
moving party must offer specific facts contradicting those averred by the movant to establish
a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.
3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary
judgment simply on the basis of the pleadings, or on conclusory statements that a factual
issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by citing to particular parts of materials in the
record . . . or showing that the materials cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot produce admissible evidence to support
the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should

be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Both of the counts in Plaintiff's Second Amended Complaint alleged that Defendants retaliated against Plaintiff because he engaged in certain activities protected by the First Amendment. "To state a First Amendment retaliation claim, a public employee plaintiff must

11

allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). "'The first factor is a question of law; the second factor is a question of fact.'" *Id.* (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)). "If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." *Id.*

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). If public employees speak in the course of their employment, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. However, if an employee speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418.

As such, a Court must apply a three-step analysis in evaluating a public employee's

retaliation claim for engaging in protected activity. *Baldassare v. New Jersey*, 250 F.3d 188,

194 (3d Cir. 2001).[2]

> First, plaintiff must establish the activity in question was protected. For this
> purpose, the speech must involve a matter of public concern. Once this
> threshold is met, plaintiff must demonstrate his interest in the speech
> outweighs the state's countervailing interest as an employer in promoting the
> efficiency of the public services it provides through its employees. These
> determinations are questions of law for the court.
>
> If these criteria are established, plaintiff must then show the protected activity
> was a substantial or motivating factor in the alleged retaliatory action. Lastly,
> the public employer can rebut the claim by demonstrating it would have
> reached the same decision even in the absence of the protected conduct.

*Id.* at 195 (alterations, internal citations, and quotation marks omitted).

Count I of Plaintiff's Second Amended Complaint claims that Defendants retaliated

against Plaintiff because he made a report to Trooper Schutter regarding the alleged bid

fixing. Count II of Plaintiff's Second Amended Complaint claims that Defendants retaliated

against Plaintiff because he filed the present lawsuit against them. Defendants do not

contest that the above acts constitute speech that is protected under the First Amendment.

Instead, all of Defendants' arguments concern the causation prong of the analysis.

"To establish the requisite causal connection a plaintiff usually must prove either (1)

an unusually suggestive temporal proximity between the protected activity and the allegedly

---

[2] The Third Circuit's decision in *Baldassare* preceded the Supreme Court's ruling
in *Garcetti*. However, a review of both decisions demonstrates that the *Baldassare* decision and the
principles upon which it is based are entirely consonant with the Supreme Court's holding and reasoning
in *Garcetti*.

retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). "For example, a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee." *Farrell*, 206 F.3d at 281.

Initially, the parties disagree about when Defendant Boyer first learned that Plaintiff engaged in protected activity. Defendant Boyer maintains that he first learned that Plaintiff had made a report to the Pennsylvania State Police when he read Plaintiff's Complaint after Plaintiff first filed his lawsuit on November 17, 2015. (Doc. 41 at ¶ 37). Plaintiff, however, argues that his testimony shows that Defendant Boyer was aware of Plaintiff's protected speech much earlier. (Doc. 47 at ¶ 37; Doc. 46 at 7). Plaintiff relies on the following portion of his deposition testimony:

Q    What is the -- how do you know that Mayor Boyer was aware of the fact that you had spoken to Trooper Schutter?

A    I believe I was told that I should watch who I tell stuff to because it comes back, stuff comes back.

Q    Who told you that?

A    The mayor.

Q    When?

14

A        I believe it was at my employee evaluation.

(Dep. of Michael Fuller, Doc. 42-1 at 49).

Defendant Boyer testimony corroborates that he made a statement to this effect at

Plaintiff's employee evaluation, but attributes a different meaning to it:

Q        And when did you have a conversation with Mike Fuller?

A        It was during his employment evaluation.

Q        And when was that?

A        That would have been August 1st of '15.

Q        And what did you state to him?

A        I had basically given him a verbal warning about discussing
         departmental matters outside of the Police Department. Mr. Fuller had
         been written up on a prior employment evaluation by Assistant chief
         Kopko about divulging department business to outside sources. And I
         had cautioned him in his employment evaluation.

         ATTY. McDONOUGH: could you spell the Assistant chief's name?

         THE WITNESS: Yes. It's K-O-P-K-O.

         ATTY. McDONOUGH: I'm sorry about that.

         THE WITNESS: Joseph Kopko.

BY ATTY. POLLICK:

Q        And what -- how did you caution him?

A        I indicated to him, I just said, "Mike", I said -- I'm trying to recall my
         exact words. But the general gist of my conversation was that
         departmental business should be kept inside. And if you have any
         complaints about the outside employment policy, if you want to talk,

15

> you could talk to me, but you shouldn't be discussing this at the
> firehouse. I had kind of felt that the people at the firehouse were sick
> of hearing him complaining, from what I heard from Mr. Story.

(Dep. of Robert Boyer, Doc. 42-3 at 33-34).

This Court cannot, on summary judgment, resolve a dispute about what Defendant Boyer actually meant by his statement. Nevertheless, this Court can determine that no reasonable jury could find that Defendant Boyer's statement was referring to the report Plaintiff made to the State Police because, at the time Defendant Boyer made the contested statement, Plaintiff had yet to speak with Trooper Schutter.

Both Plaintiff and Defendant Boyer testified that Defendant Boyer's statement that Plaintiff "should watch who [he] tell[s] stuff to" occurred at Plaintiff's employee evaluation. These two parties also testified that the evaluation took place on August 1, 2015. (Dep. of Michael Fuller, Doc. 42-1 at 51; Dep. of Robert Boyer, Doc. 42-3 at 33). Plaintiff testified that he contacted Trooper Schutter on the same day he first learned of the alleged bid fixing, although Plaintiff seemed somewhat unsure as to the specific date of when this occurred.[3] (Dep. of Michael Fuller, Doc. 42-1 at 38, 40-41). Plaintiff's cell phone records, however, establish that his first phone call to Trooper Schutter was placed on August 6, 2015. (Doc. 42-2 at 26). Further, the parties agree that Plaintiff only met with the Trooper once and that the meeting occurred on August 7, 2015. (Doc. 41 at ¶¶ 9-10; Doc. 47 at ¶¶

---

[3] Specifically, Plaintiff testified that contacted Chris Mercavitch and Trooper Schutter on the same day he talked to Story about the dump truck bid. (Dep. of Michael Fuller, Doc. 42-1 at 40). When asked about the specific date he contacted Mercavitch, he responded "I believe it was July 28th maybe." (Id. at 38).

9-10). Accordingly, Defendant Boyer's contested statement occurred a week before Plaintiff made his report to Trooper Schutter. As such, no reasonable jury could find that Defendant Boyer's statement that Plaintiff "should watch who [he] tell[s] stuff to" indicated that Defendant Boyer knew Plaintiff had made a report to the State Police. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Consequently, the earliest point in time for which there is record support that Defendant Boyer knew about Plaintiff's report to the State Police is November 17, 2015—the day the lawsuit was filed.

Turning to the individual claims, Plaintiff's first retaliation claim is predicated on the allegation that Defendants retaliated against Plaintiff because he made a report to Trooper Schutter. All of the alleged retaliatory conduct that forms the basis of this claim, however, occurred prior to November 17, 2015. (Doc. 21 at ¶¶ 11-32). "It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). Because no reasonable jury could find that Defendant Boyer knew of Plaintiff's report to the State Police before November 17, 2015, any adverse employment actions taken up until that date could not, as a matter of law, be causally connected to

17

Plaintiff's report. Therefore, the Court will grant Defendants' Motion as it pertains to Count I of Plaintiff's Complaint.

Plaintiff's second claim alleges that Defendants retaliated against him because he filed a lawsuit against them. Specifically, Plaintiff has alleged the following adverse employment actions were taken against him after November 17, 2015: (1) Defendant Boyer ignored Plaintiff at the West Side Santa parade; (2) Plaintiff was denied his longevity and sick day pay and his clothing allowance; (3) Defendant Boyer paid part-time officers a cash bonus at Christmas, but did not pay Plaintiff a cash bonus; (4) on January 7, 2016, Plaintiff was suspended for five days; (5) Defendants took the position of custodial officer away from Plaintiff; (6) Plaintiff never received the combination to the Street Department after the locks were changed; (7) Plaintiff was restricted from accessing the internet to order office supplies; (8) Plaintiff was denied training that part-time officers received; (9) Plaintiff's stepson and wife were not included on his life insurance policy; (10) on April 6, 2015, Plaintiff was suspended for fifteen days; and (11) while serving a suspension, Plaintiff received notice of another disciplinary hearing. (Doc. 21 at ¶¶ 45, 47-49, 51-58). Plaintiff argues that this culminated in his constructive discharge when he was forced to resign to avoid this harassment. (*Id*. at ¶ 59).

Defendants argue that they are entitled to summary judgment because Plaintiff had been on notice that he was in violation of the outside employment policy before he spoke

with the State Police.[4] (Doc. 43 at 7-8). In essence, Defendants argue that this is a manufactured claim where Plaintiff, knowing he would be punished for his refusal to follow the outside employment policy, used his speech to delegitimize the impending discipline. (*Id*. at 6-8). Defendants further contend that this Court, on the record before it, can make a summary judgment determination without consideration of either party's motivations. (*Id*. at 7).

The Court cannot, however, reach the conclusion that Defendants urge this Court to reach without impermissibly making findings of fact. Even if Defendants are correct and Plaintiff filed his Complaint to insulate himself from future discipline, Plaintiff would still have a valid cause of action if the act of initiating the lawsuit "was a substantial or motivating factor in the alleged retaliatory action." *Baldassare,* 250 F.3d at 195. Thus, despite Defendants' assertions to the contrary, to rule in their favor this Court would necessarily have to make the finding that Plaintiff's lawsuit was not a substantial or motivating factor in Defendants' disciplinary decisions. The timeline of events in this case, however, make such a ruling inappropriate on summary judgment.

Plaintiff received a letter from Defendant Boyer on September 11, 2015, giving him thirty days to come into compliance with the outside employment policy. (Doc. 42-2 at 1, 33). October 11, 2015, appears to have passed without any follow up from Defendants.

---

[4] Plaintiff argues that Defendants have failed to move for summary judgment with respect to Count II because they "never mention[ed] the protected activity of filing Plaintiff's Federal Complaint." (Doc. 46 at 2 n.1). Fairly read, however, Defendants' brief seeks summary judgment on both counts. (Doc. 43 at 14). The Court will therefore address Defendants' arguments as they pertain to Count II.

Then, on November 17, Defendants became aware that Plaintiff had filed a lawsuit against them. (Doc. 1; Doc. 41 at ¶ 37). Less than a week later, at the request of Defendant Boyer, Plaintiff submitted the hours he had been working at his other jobs—although the record is unclear as to when Defendant Boyer made this request. (Doc. 42-2 at 35). Then, approximately eighteen days after the lawsuit was filed, Plaintiff received notice that a Loudermill hearing would be convened to address Plaintiff's alleged policy violation. (Doc. 42-5 at 2-3). That hearing ultimately culminated in Plaintiff's first suspension from work. (Doc. 42-2 at 1).

Viewing the record as a whole, this timeline is unusually suggestive. Plaintiff was initially given a month to comply with the policy, but nothing occurred after the month expired. Then, around the time Plaintiff initiated his lawsuit, Defendant Boyer requested that Plaintiff provide him the number of hours Plaintiff had been working at his other jobs. Eleven days after receiving a response from Plaintiff, Defendants notified Plaintiff of his Loudermill hearing. Viewing this evidence in a light most favorable to Plaintiff, a reasonable jury could infer that Defendants had a retaliatory motive in starting the disciplinary process so shortly after Plaintiff's lawsuit was filed. Moreover, it is impossible to tell from the record before the Court whether Plaintiff's protected activities affected the severity of the discipline imposed by Defendants.

Nevertheless, Defendants point to their pre-speech actions as strong evidence that they would have imposed the same discipline regardless of whether Plaintiff filed the

lawsuit. The Court agrees that this evidence could support such a conclusion. On summary judgment, however, the Court cannot side with Defendants' version of events. Given the timeline of events and viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could infer that Defendants had a retaliatory motive in disciplining Plaintiff after he filed a lawsuit against them. As such, Defendants argument is more appropriate for a jury at trial then for a judge at summary judgment. Accordingly, the Court will deny Defendants' Motion for Summary Judgment as it pertains to Count II of Plaintiff's Complaint.

Lastly, Defendants raise one alterative argument. They argue that if any of the first amendment claims are allowed to proceed, Plaintiff's potential recovery should be limited to the time period before Plaintiff resigned. Stated otherwise, Defendants argue that Plaintiff's allegation that he was constructively discharged should fail as a matter of law. (Doc. 43 at 15). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). This is an objective test; the question is "'[d]id working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?'" *Hill*, 455 F.3d at 232 n.7 (quoting *Pa. State Police*, 542 U.S. at 141); *see also Bailor v. Taylor*, 170 F. Supp. 2d 466, 471 (D. Del. 2001). Accordingly, "'the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'" *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992) (quoting

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)). Relevant considerations

when evaluating a claim of constructive discharge include "whether the employer (1)

threatened the employee with discharge or urged or suggested that she resign or retire, (2)

demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less

desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job

evaluations." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (internal quotation

marks and alterations omitted) (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159,

1161 (3d Cir. 1993)).

Here, Plaintiff identifies several factors from which he argues that a reasonable jury

could conclude that he was forced to resign: (1) Plaintiff lost twenty days of pay due to

suspensions; (2) the evidence custodian position was taken away from him; (3) he did not

receive a personal gift of money from Defendant Boyer at Christmas like other officers did;[5]

(4) Plaintiff was forced to check on businesses' garbage cans when he had never had to do

that in the past; (5) Plaintiff never received the combination to the Street Department after

the locks were changed; (6) a third Loudermill hearing was scheduled while Plaintiff was on

suspension; and (7) Plaintiff was fearful of being fired and losing his retirement benefits.

(Doc. 46 at 13).

---

[5] Although Plaintiff characterizes this as a "Christmas bonus," it is undisputed that the money that the other officers received were personal gifts from Defendant Boyer, not from their employer. (Dep. of Michael Fuller, Doc. 42-1 at 93; Dep. of Robert Boyer, Doc. 42-3 at 78-79).

Initially, the record does not support some of Plaintiff's assertions. First, Plaintiff's Complaint alleges that Plaintiff was required to check whether "businesses had garbage out for pickup and to maintain a log of the same" starting on October 6, 2015.. (Doc. 21 at ¶ 21). Because this occurred over a month before Defendants had knowledge about Plaintiff's lawsuit or report to the State Police, it could not have been a retaliatory change in his position. Second, with respect to Plaintiff not receiving the Street Department combination, the record is undisputed that no one except the Police Commissioner received the new combination. (Aff. of Michael Flanagan, Doc. 42-7 at ¶ 2).[6] Thus, even when viewing the evidence in a light most favorable to the nonmoving party, Plaintiff was not singled out or treated differently by not receiving the combination to the Street Department.

Further, the fact that a third Loudermill hearing was scheduled while Plaintiff was on suspension and that Plaintiff was fearful of being fired and losing his retirement benefits are irrelevant to his assertion that his resignation was involuntary because "[t]he law of constructive discharge is not concerned with subjective fears of possible future dismissal." *Tunis v. City of Newark*, 184 F. App'x 140, 143 (3d Cir. 2006). Thus, Plaintiff's allegation of constructive discharge hinges on the fact that Plaintiff lost twenty days of pay due to Defendants' suspending him, he did not receive a personal gift of money from Defendant

---

[6] Plaintiff testified at his deposition that other officers were provided with the combination to the Street Department. (Dep. of Michael Fuller, Doc. 42-1 at 110). However, that statement was the product of a leading question from his counsel and has been stricken from the record.

Boyer at Christmas, and Defendants took the position of evidence custodian away from him. With this in mind, the Court turns to the factors outlined in *Colwell*.

Several of the *Colwell* factors favor Defendants' position. Plaintiff was not threatened or encouraged to resign. Nor was he demoted or involuntarily transferred to a less desirable position. On the other hand, several factors lend some, but insufficient, support to Plaintiff's position. Plaintiff's suspensions did constitute a reduction in his pay as well as an unsatisfactory job evaluation. With respect to these suspensions, however, the fact that Plaintiff left his job before pursuing the grievance that he submitted indicates that he did not make a "reasonable effort to explore alternatives before electing to resign." *Colwell*, 602 F.3d at 503; *see also Clowes*, 991 F.3d at 1161 ("a reasonable employee will usually explore . . . alternative avenues thoroughly before coming to the conclusion that resignation is the only option").

Another factor merits consideration in this case. According to Plaintiff, besides the reasons cited above, he had another basis for resigning:

> Q   So it's correct that you were unwilling to limit the number of hours you worked outside of Wyoming?
>
> A   Yes.
>
> Q   And that's at least one of the reasons that you resigned?
>
> A   Yes, because it wasn't part of my collective bargaining agreement and I felt I was being harassed.

(Dep. of Michael Fuller, Doc. 42-1 at 94). This Court need not resolve the issue of whether enforcement of the outside employment policy violated the collective bargaining agreement. It is sufficient to say that it is undisputed that Defendants were attempting to have Plaintiff comply with that policy before they were aware of his report to the State Police or his lawsuit. Thus, according to his own testimony, Plaintiff's resignation was due in part to his unwillingness to comply with a policy that was being enforced prior to his protected activities.

In light of the above, no reasonable jury could conclude that Plaintiff's "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Hill,* 455 F.3d at 232 n.7 (quoting *Pa. State Police,* 542 U.S. at 141). Rather, Plaintiff's motivation for resigning was at least in part due to considerations other than the alleged retaliatory conduct, Plaintiff did not act reasonably in resigning before following through with the grievance procedures, and Plaintiff's secondary complaints not related to his suspensions—such as being removed from the position of evidence custodian and not receiving a monetary gift from Defendant Boyer—are inconsequential and do not, under any rational view of the employer-employee relationship, provide the slightest basis to support a claim of constructive discharge.[7] Accordingly, the Court will grant Defendants'

---

[7] Although Plaintiff did not raise, and therefore waived, any argument that the other alleged retaliatory actions that were cited elsewhere in his brief contributed to his resignation, the Court notes that its analysis would not change even when considering these additional points. The record simply does not support that these were anything but minor annoyances which would not provide a basis for a jury to conclude that Plaintiff was constructively discharged. For example, Plaintiff claims that Defendants retaliated against him by not including his sick and longevity pay in his December 11, 2015, paycheck.

Motion to the extent it seeks to limit Plaintiff's potential recovery to the time period before his resignation.

## V. CONCLUSION

For the reasons outlined above, this Court will grant in part and deny in part Defendants' Motion. A separate Order follows.

Robert D. Mariani
United States District Judge

---

(Doc. 46 at 8). The record, however, is undisputed that Plaintiff's sick and longevity pay were given to him by the end of December. (Aff. of Tamra Smith, Doc. 42-6 at ¶ 2). While such a minor delay, if done with retaliatory motive, may help establish Plaintiff's first amendment claim, it does not create working conditions that are so intolerable that a reasonable person would feel compelled to resign.